# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT JACKSON

STATE AUTOMOBILE INSURANCE
COMPANY,

        Plaintiff/Appellee,

VS.

LASHLEE-RICH, INC.,

        Defendant/Appellant.

) 
) 
) 
) Gibson Chancery No. H 3443
) 
) Appeal No. 02A01-9703-CH-00071
) 
) 
) 
)

FILED

December 22, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

APPEAL FROM THE CHANCERY COURT OF GIBSON COUNTY
AT HUMBOLDT, TENNESSEE
THE HONORABLE GEORGE R. ELLIS, CHANCELLOR


**MITCHELL G. TOLLISON**
**HAWKS & TOLLISON**
Humboldt, Tennessee
Attorney for Appellant


**JAMES E. CONLEY, JR.**
**THOMASON, HENDRIX, HARVEY, JOHNSON & MITCHELL**
Memphis, Tennessee
Attorney for Appellee


**AFFIRMED**


**ALAN E. HIGHERS, J.**


**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**DAVID R. FARMER, J.**

      Defendant/Appellant, Lashlee-Rich, Incorporated ("Lashlee-Rich") appeals the

judgment of the trial court granting Plaintiff/Appellee's, State Automobile Mutual Insurance Company ("State Auto"), request for declaratory judgment whereby the trial court ruled that Lashlee-Rich had violated the clear language of the insurance policies issued by State Auto and that no coverage existed under said insurance policies issued by State Auto to Lashlee-Rich. For reasons stated hereinafter, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

On November 9, 1994, Lashlee-Rich was engaged in commercial construction services when it was chiseling out a concrete water drainage ditch on the interior of a production facility owned by J. Hungerford Smith ("Smith"). During the work process, an employee of Lashlee-Rich was using a jackhammer to chisel out the existing concrete trench when his bit severed a pipe under which there was electrical service running. As a result, the electrical wiring was damaged.

Smith is in the business of making ice cream toppings. The electrical line severed by Lashlee-Rich supplied power to the office area, the sugar system component of the production process, the main computer, the finance area, and the shipping department of Smith.

On November 10, 1994, the day after the damage was done, Lashlee-Rich contracted with Heglar Plumbing to perform the necessary repairs. At the time of the incident in question, there was a general liability policy in effect issued by State Auto.

By letter dated November 11, 1994, Lashlee-Rich sent State Auto's agent notice of the occurrence of the incident in question. Also stated in the letter was the fact that the necessary repairs had been undertaken to keep Smith's manufacturing facility operational. However, absent from this letter was any notice to State Auto that Lashlee-Rich had assumed an obligation to pay Heglar Plumbing for said repairs. Lashlee-Rich never sought nor received any advice nor authorization from any representative of State Auto to hire Heglar Plumbing to repair the damage to Smith's facility.

2

The bill from Heglar Plumbing for $17,245.95 was submitted to State Auto's agent by letter dated November 18, 1994. By letters dated December 15, 1994, State Auto advised Lashlee-Rich and Smith that its investigation revealed no negligence or liability on the part of Lashlee-Rich. After receiving this letter from State Auto, Lashlee-Rich made payment to Heglar Plumbing for the repair work.

State Auto filed a complaint for declaratory judgment in the Chancery Court at Gibson County, Tennessee, at Humboldt on March 30, 1995. Lashlee-Rich filed an answer and motion for joinder on December 5, 1995. On January 11, 1996, Smith filed its response to motion for joinder and a motion to dismiss. By order dated March 8, 1996, the trial court denied Lashlee-Rich's motion for joinder and granted the motion to dismiss Smith. On December 19, 1996, this cause came before the Chancery Court at Gibson County.

At trial, Lashlee-Rich asserted that their prompt action in retaining electrical service to restore Smith's facility resulted in a mitigation of the down time and loss of revenues of Smith. Lashlee-Rich presented further testimony that it acted out of a sense of urgency in getting the electrical supply restored to Smith. Smoke and sparks were emanating from the electrical line and Lashlee was afraid of further damage to Smith's facility. Additionally, Lashlee-Rich contended that there was a safety issue involved as the exposed main electrical feed was of sufficient power to pose a danger to life.

In anticipation of and in response to these assertions, State Auto presented evidence that Smith would have done whatever necessary to get the plant operational if Lashlee-Rich had not arranged for Heglar Plumbing to make the repairs. State Auto produced additional testimony that Lashlee-Rich had a long standing business relationship with Smith which would have been put into jeopardy if Lashlee-Rich had not undertaken to repair the damage. State Auto contended that Lashlee-Rich's assumption of the obligation to pay for the repair work was for these reasons and not for safety reasons or to mitigate damages as Lashlee-Rich asserted. Most importantly, State Auto relied upon

the provisions in the policies stating that no insureds were to assume an obligation, except at their own expense, incur an expense or voluntarily make any payments without the consent of State Auto. State Auto contended that Lashlee-Rich assumed an obligation and voluntarily made payment to Heglar Plumbing without their consent and, thus these actions were undertaken at Lashlee-Rich's own expense.

The trial court determined that State Auto had no obligation under the policies of insurance it had issued to Lashlee-Rich and entered a judgment to this effect on January 27, 1997. This appeal ensued.

On appeal, the issues for review are as follows: (1) Whether the trial court erred in deciding that Lashlee-Rich violated the language of the policies issued by State Auto; (2) Whether Lashlee-Rich acted in accordance with general contract principles in mitigating damages thus excusing any technical breach of the insurance contract; and (3) Whether State Auto was estopped to assert the defense of voluntary payment by Lashlee-Rich under principles of waiver and estoppel.

## LAW AND DISCUSSION

Inasmuch as this case was tried by the trial court sitting without a jury, this Court's review on appeal is governed by Tennessee Rule of Appellate Procedure 13(d), which directs us to review the case *de novo*. *Roberts v. Robertson County Bd. of Educ.*, 692 S.W.2d 863, 865 (Tenn. Ct. App. 1985); *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 300 (Tenn. Ct. App. 1984); T.R.A.P. 13(d). In conducting a *de novo* review of the record below, however, this Court must presume that the trial court's findings of fact are correct. Under this standard of review, we must affirm the trial court's decision unless the trial court committed an error of law affecting the result or unless the evidence preponderates against the trial court's findings. *Roberts*, 692 S.W.2d at 865.

The applicable provisions of the commercial general liability policy issued by State Auto to Lashlee-Rich are as follows:

4

SECTION I - COVERAGES

Coverage A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. . .

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

2. Duties in Event of Occurrence, Offense, Claim for Suit.
d. No insureds will, except at their own cost, voluntarily make a payment, assume an obligation, or incur any expense, other than for first aid, without our consent.

The applicable provisions of the commercial umbrella liability policy issued by State Auto to Lashlee-Rich are as follows:

PART B.  COVERAGES - EXCLUSIONS - CONDITIONS- DEFINITIONS

SECTION I, COVERAGE A - Excess Liability Coverage.

1. Insuring Agreement

a. We will pay those sums, in excess of the amount payable under the terms of any "underlying insurance," that the insured becomes legally obligated to pay as damages because of injury or damage to which this insurance applies, provided that the "underlying insurance" also applies, or would apply but for the exhaustion of its applicable limits of insurance.

b. We will have the right to participate in the defense of claims or suits

5

against the insured seeking damages because of injury or damage to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "underlying insurance" has been used up by payment of judgments, settlements and any cost or expense subject to such limit.

d.  This insurance is subject to the same terms, conditions agreements, exclusions and definitions as the "underlying insurance," except:

(1)  We will have no obligation under this insurance with respect to any claim or suit that is settled without our consent.

SECTION II, COVERAGE B - Extended Liability Coverage

1.  Insuring Agreement

PART E - General Conditions

C.  Duties in the event of an incident, claim or "suit."

4.  No insureds will, except at their own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**WHETHER THE TRIAL COURT ERRED IN DECIDING THAT LASHLEE-RICH VIOLATED THE LANGUAGE OF THE POLICIES ISSUED BY STATE AUTO.**

When the terms of an insurance contract are plainly written and there is nothing to the contrary, the parties are bound thereby. *Artress v. State Farm Fire and Casualty Co.*, 221 Tenn. 636, 429 S.W.2d 430, 432 (Tenn. 1968). Where an insurance contract is plain and unambiguous, the parties are bound by its terms, and courts cannot under the guise of construction make a new and different contract for the parties. *United States Stove Corp. v. Aetna Life Ins. Co.*, 169 Tenn. 264, 84 S.W.2d 582 (Tenn. 1935). Insurance

6

contracts are subject to the same rules of construction and enforcement as applied to contracts generally. *McKimm v. Bell*, 790 S.W.2d 526 (Tenn. 1990). In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust. *Ballard v. North American Life & Casualty*, 667 S.W.2d 79 (Tenn. Ct. App. 1983); *Allstate Insurance Co. v. Wilson*, 856 S.W.2d 706, 708 (Tenn. Ct. App. 1993). In construing contracts, the words expressing the parties' intentions should be given the usual, natural and ordinary meaning. *Id.*

In their brief, State Auto relies on *Anderson v. Dudley Moore Ins. Co.*, 640 S.W.2d 556 (Tenn. Ct. App. 1982) as factually similar to the case at bar. In *Anderson*, a broker took a fire insurance application but failed to relay the application to insurer for nearly three months. *Anderson*, 640 S.W.2d at 556. When the applicants' mobile home burned, the broker voluntarily paid the applicants $10,000 for fire loss, and took from the applicants an assignment of rights against insurer. The broker then brought an action against the insurer to recover its payment to the applicants, and later amended its complaint to include cause of action against the broker's errors and omissions carrier. Pertinent language in the broker's policy with the errors and omissions carrier provided that "[t]he insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense." *Id.* at 559. The middle section noted that although the broker's errors and omissions carrier had notice of the potential demand for repayment, the broker never made any formal request that the carrier investigate, defend, or pay the claim until long after it had made the *ex parte* payment to the applicants. *Id.* at 560. The court went on to state that it could not ignore the express words contained in the agreement between the broker and his errors and omissions carrier and ruled that coverage could be denied on that basis.

In this case, under both the commercial general and commercial umbrella liability policies, State Auto has the right and duty to defend any suit seeking damages, the right to investigate any claim and the right to settle any claim or suit that may result. However, by making the payment to Heglar Plumbing and then seeking reimbursement for such payment, Lashlee-Rich attempted to bypass the plain, unambiguous language in the insurance contracts and thereby divest State Auto of its rights to oversee the handling of

7

any claim.

Furthermore, under the commercial general liability policy, State Auto is under no obligation to reimburse an insured for payments made by that insured for any obligation assumed or expense incurred without the consent of State Auto other than for first aid. In this case, Lashlee-Rich assumed the obligation to pay Heglar Plumbing on November 10, 1994. After a careful examination of the record, however, we find that Lashlee-Rich never informed State Auto of this assumed obligation to Heglar Plumbing until after the insurance adjuster made the determination of no liability on Lashlee-Rich's behalf. State Auto never consented to Lashlee-Rich's assumption of the obligation to make payment for the repair work at Smith. Lashlee-Rich incurred an obligation to pay Heglar Plumbing before State Auto ever made any kind of decision or had the opportunity to make a decision on the claim. This is in direct contravention of the provision in question.

In their brief, Lashlee-Rich argues that their actions fall within the "first aid" exception of the provision. They contend that the term "first aid" is ambiguous and, therefore, should be construed in their favor. However, we believe that the plain, ordinary meaning of "first aid" concerns the emergency handling of personal illnesses or injuries and not property damage. In fact, Webster's Ninth New Collegiate Dictionary defines "first aid" as "emergency care or treatment given to an ill or injured person before regular medical aid can be obtained." *Webster's Ninth New Collegiate Dictionary* 466 (1985). Lashlee-Rich would have this Court believe that it acted in a reasonably prudent manner to an urgent and dangerous situation requiring emergency action so as to render such situation in "the nature of 'first aid.'" We fail to find in the record any evidence of personal illness or injury to anyone thereby causing this incident to fall within the "first aid" exception to the general commercial policy.

Additionally, under the terms of both the commercial general and umbrella liability policies, State Auto is only obligated to pay those sums that the insured becomes legally obligated to pay as damages. In the case at bar, Lashlee-Rich has not been found legally

8

obligated to pay any amount as damages; therefore, State Auto is not obligated to pay the $17,245.95 that Lashlee-Rich paid to Heglar Plumbing.

Like *Anderson*, we conclude that Lashlee-Rich's actions were in direct contravention of the unambiguous language of the policies in question. Lashlee-Rich did undertake an obligation to pay Heglar Plumbing for the repair work and did, in fact, voluntarily pay Heglar Plumbing for said work. Lashlee-Rich gave no notice to State Auto and did not demand payment from State Auto until after it had assumed the obligation to make payment to Heglar Plumbing. In doing so, undoubtedly, Lashlee-Rich violated the clear language of the policies by assuming an obligation, voluntarily making payment and incurring an expense without State Auto's consent. Lashlee-Rich did all of the foregoing to their own peril.

### WHETHER LASHLEE-RICH ACTED IN ACCORDANCE WITH GENERAL PRINCIPLESIN MITIGATING DAMAGES THUS EXCUSING ANY TECHNICAL BREACH OF THE INSURANCE CONTRACT.

Lashlee-Rich submits that in paying Heglar Plumbing it was mitigating its damages. We find this argument to be without merit. The doctrine of mitigation of damages, sometimes called the doctrine of avoidable consequences, imposes upon an injured party a duty to exercise reasonable diligence and ordinary care in attempting to minimize his or her damages after the injury has been inflicted. *Black's Law Dictionary* 904 (5th ed. 1979). In this case, Lashlee-Rich is not the injured party. Smith is the party that sustained an injury. We feel that Lashlee-Rich's reliance on the doctrine of mitigation of damages is misplaced.

Furthermore, even if the doctrine of mitigation of damages were germane to third party injuries in liability insurance contracts, this doctrine would not apply to the facts of this case. Malcom Chapin, plant manager of Smith, when asked:

> Q. . . . but as the plant manager faced with the electrical problem, you would have taken whatever steps were necessary to be sure your plant was ready to go the following Monday; wouldn't you?
>
> A. Yes.

9

Q. You would have done whatever it took?

A. Yes.

Thus, Lashlee-Rich's assumption of an obligation to pay for the repair work was not necessary to place Smith's facility in an operational mode. No damages were mitigated because if Lashlee-Rich had not agreed to pay for the repair work, Smith was going to do whatever it took to regain its plant operation. At this point, it is imperative that we note that State Auto did not deny the claim of Lashlee-Rich. Had Lashlee-Rich been sued for payment of the repair work, the record evinces that State Auto would have defended the suit, and any judgment that might have been entered would have been paid pursuant to the terms of the policy. However, Lashlee-Rich stepped outside the policies by assuming the obligation to pay and subsequently paying for the repair work. To quote the direct language of the commercial general liability policy: "No insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." Consequently, Lashlee-Rich made the payment to Heglar Plumbing "at their own cost."

### WHETHER STATE AUTO WAS ESTOPPED TO ASSERT THE DEFENSE OF VOLUNTARY PAYMENT BY lASHWEREANDHESTOPPELHE PRINCIPLES OF

Lashlee-Rich's claim of estoppel as to State Auto is likewise without merit. Lashlee-Rich contends that State Auto should be estopped from asserting the contractual provision excluding coverage if the insured "assumed an obligation and incurred expenses" or made "voluntary payment" in order to attempt to defeat coverage after Lashlee-Rich made payment to Heglar Plumbing for the repair work. In light of *Anderson*, had Lashlee-Rich asked State Auto to do something in relation to the claim which it had refused to do, or had suit been filed against Lashlee-Rich and State Auto failed to defend, Lashlee-Rich might have an estoppel argument. Nothing of this nature occurred. State Auto was notified of the matter only after Lashlee-Rich had already assumed the obligation to pay Heglar Plumbing for the repair work at Smith. No advice was sought; no authorization was obtained.

10

We feel it is imperative to note that at the time of the December 15 letter from State Auto informing Lashlee-Rich that the insurance adjuster found no negligence on Lashlee-Rich's part, State Auto was not cognizant of the fact that Lashlee-Rich had assumed the obligation to make payment to Heglar Plumbing for the repair work undertaken at Smith. Neither the November 11 or the November 18 letter from Lashlee-Rich advised State Auto that Lashlee-Rich had assumed such an obligation. As a result, State Auto's basis for nonpayment, as stated in the December 15 letter, was a finding of no liability or negligence on the part of Lashlee-Rich. State Auto had no reason to invoke the provisions of its policies concerning assumption of an obligation without the consent of State Auto when they were devoid of any knowledge that Lashlee-Rich had assumed an obligation to pay Heglar Plumbing for repair work at Smith.

Like the trial court, we too understand that Lashlee-Rich may have acted as they did for several reasons. They undoubtedly have a long, well established business relationship with Smith and desired to maintain such a relationship. In doing so, however, they found themselves in direct contravention of the language in the insurance policies issued by State Auto. As mentioned above, in the absence of fraud or mistake, an insurance contract must be interpreted and enforced as written even though it contains terms which may be thought to be harsh and unjust.

Accordingly, the judgment of the trial court is affirmed. Costs of this appeal are taxed to appellant Lashlee-Rich, for which execution may issue if necessary.

_____

_____HIGHERS, J.


CONCUR:


_____
CRAWFORD, P.J., W.S.


_____

11

FARMER, J.  (not participating)